IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,            )
                                     )
                                     )
            Plaintiff,               )
                                     )
vs.                                  )   CASE NO. CR-22-380-R
                                     )
                                     )
ANDREWE STEVEN HANSEN,               )
                                     )
                                     )
                                     )
            Defendant.               )
                                     )


TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE DAVID L. RUSSELL

UNITED STATES DISTRICT JUDGE

DECEMBER 11, 2023


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

Emily Cripe, CSR
United States Court Reporter
U.S. Courthouse, 200 N.W. 4th St.
Oklahoma City, OK 73102 * 405.609.5094

1                          APPEARANCES

2    FOR THE GOVERNMENT:

3         Ms. Mary E. Walters
          Assistant United States Attorney
4         U.S. Attorney's Office
          210 West Park Avenue, Suite 400
5         Oklahoma City, Oklahoma 73102

6

7    FOR THE DEFENDANT:

8         Mr. Henry A. "Hank" Meyer, III
          Attorney at Law
9         210 Park Avenue, Suite 3030
          Oklahoma City, Oklahoma 73102

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Proceedings had on December 11, 2023.)

2                THE COURT:  This is United States vs. Andrewe

3    Steven Hansen, CR-22-380.

4        Will the parties make their appearance for the record,

5    please.

6                MS. WALTERS:  Mary Walters for the United States,

7    Your Honor.

8                MR. MEYER:  Your Honor, Hank Meyer on behalf of

9    Andrewe Hansen, and Mr. Hansen is right here to my immediate

10   left, Your Honor.

11               THE COURT:  All right.  I have received the

12   presentence report, to which there is an objection.  I don't

13   think anything that would affect the guidelines.

14       But correct me, Mr. Meyer, if I'm wrong, but my

15   understanding -- I have read all your materials -- is that the

16   essence of it is that -- that the actions of Mr. Hansen and

17   Ms. Nguyen did not cause this individual's death or contribute

18   to it.  Is that the essence of it?

19               MR. MEYER:  It's different than what you just said.

20   You just said it can -- I'm sorry, Your Honor.

21       You just said it did not contribute to it or was a -- it

22   might have been a substantial cause.  I'm saying that in

23   accordance with Justice Scalia's decision that it has to be

24   "but for."  But for that cause -- pause, Mr. Hansen --

25   Mr. Reeder would not have died.  That's the test.

```
 1              THE COURT:  I mean, I accept that.
 2              MR. MEYER:  Okay.  The second thing I did, I -- I'm
 3  sorry.
 4              THE COURT:  To me, the essence of this case is
 5  whether your client and Ms. Nguyen took an action, stopped the
 6  medication, and whether they lied about it.  It's not whether
 7  they killed this man or contributed to killing him.  The
 8  essence is did they stop the medication and did they lie about
 9  it.
10              MR. MEYER:  I'm in agreement that it is -- the
11  whole essence of this case is a false claim.  That's what it's
12  all about.
13      But that I also pointed out in the sentencing memorandum,
14  the elephant in the room is the death of Mr. Reeder.  If you
15  look at the PSR, the last paragraph of the PSR mentions that it
16  hastened.  There isn't any evidence that it hastened the death.
17              THE COURT:  I agree with that.  Really, to me, this
18  case would be no different if the man had lived.
19              MR. MEYER:  I don't think the VA had a choice but
20  to do a craniectomy.
21              THE COURT:  To do what?
22              MR. MEYER:  I do not believe the VA -- I believe
23  that if you have this kind of fall and that you increase the
24  pressure in your brain and you do nothing, you die because the
25  brain is -- you know, encapsulates -- is encapsulated in your
```

1    skull.

2        So the VA didn't have a choice, in my mind, but to perform

3    that operation.  But as I would go into in some of this on the

4    evidence, prior to the operation he had consciousness, and

5    after the operation he never had consciousness.

6        And that -- in addition to that, Your Honor, I think that

7    the evidence in here shows that he had a brain hemorrhage on

8    his --

9            THE COURT:  I don't doubt any of that.  I'm not

10    sure what you're arguing about.

11            MR. MEYER:  I'm trying to get that -- I think that

12    -- when I say it's the elephant in the room, I think it's the

13    reason that an agreement that had been reached between the

14    defense and the United States of America on a probation, that's

15    not good enough in your mind.

16            THE COURT:  Let me ask.

17            MR. MEYER:  Yes, sir.

18            THE COURT:  It's ambiguous in your submissions and,

19    frankly, in the defendant's, whether the defendant stopped the

20    medication.  Did he stop the medication?

21            MR. MEYER:  There's no question.  He's going to

22    tell you that when he gives his statement.

23            THE COURT:  And did he lie about it?

24            MR. MEYER:  Yes, he did.  There's no question.

25    That's why we pled guilty to it.

1        THE COURT:  All right.

2     Is there anything else as far as the presentence report

3  that I need to deal with?

4        MR. MEYER:  Well, I think that you should take --

5  be aware of the fact that in the -- in the letter that I wrote

6  on November 3rd, 2023, in opposition, that the Alaris Pump was

7  subject -- that is the same pump that was in use at the time --

8  was subject to a recall by the Federal Drug Administration.  I

9  believe the numbers are in my brief -- are in that letter.

10  It's about 145,000 of them.

11     As we are here today, the reason they were on a recall is

12  that they could result in that machine causing a coma or death.

13  And that we -- as we are here, we don't know whether or not

14  that pump was subject to that call, but we know it's the same

15  kind of pump and we know it's made by Becton Dickinson.  So I

16  think that's another unusual fact.

17        THE COURT:  I still don't understand the relevance

18  of that.  To me, the only relevant thing in regard to

19  sentencing is if he intentionally withheld medication and if he

20  lied about it.

21        MR. MEYER:  He will tell you -- he will answer

22  those two questions in the affirmative, that he intentionally,

23  you know, paused the pump and that he lied about it.

24        THE COURT:  And why did he intentionally pause the

25  pump?

1          MR. MEYER:  He's going to tell you why.  And that

2     before we go on -- I do have -- I would like to get admitted a

3     letter that I received this morning from Steve Chamberlin.  I

4     have given a copy to the U.S. attorney.  It's from Steve

5     Chamberlin, who is a licensed professional counselor.

6          THE COURT:  That's fine.  I'll read it right now.

7     I have read all your other materials, but I'll read that.

8          Yes, I have read that.  Thank you.

9          Anything else I need to deal with as far as the

10    presentence report?

11         MR. MEYER:  No, Your Honor.

12         THE COURT:  All right.  Defendant and counsel come

13    to the podium then, please.

14         All right.  I guess I have already indicated this, but I

15    have read all the materials, Mr. Meyer, you have submitted, and

16    the letters and your sentencing memorandum and the letter from

17    the defendant.

18         Would you like to make a further statement at this time?

19         THE DEFENDANT:  Yes, Your Honor.

20         THE COURT:  Well, actually, I'm addressing it first

21    to Mr. Meyer.  Do you want to make a statement now or do you

22    want your client to make it first?  I'll leave it up to you.

23         MR. MEYER:  Since the Court has told us about

24    their -- their understanding, which is in agreement with the

25    but-for test, I won't go into the depth that I went through

1  specifically in that case, or in my sentencing memorandum or in
2  my objection letter.

3      But I think that it's -- it is important to note that on
4  the -- there was an operation on my client after he started
5  work in March of 2021 with -- called a vertical sleeve, where
6  his stomach was reduced by 85 percent, and I pointed out in the
7  sentencing memorandum that it usually takes a human being three
8  to four weeks to recover from.

9      He was under contract with the Veteran's Administration
10  and he asked for additional time and they said you can have
11  three days, the three days being the day of the operation and
12  two more days, and you need to come back to work in accordance
13  with the contract.

14      That took place.  When the surgery was finished, he was
15  given a prescription for OxyContin, Percocet, and I think it
16  was .5 milligrams, and told to take two or three every four
17  hours.

18      In addition to that, his doctor said you need to go ahead
19  and use medical marijuana gummies to increase the -- decrease
20  the pain level because you can't have ibuprofen.  Your stomach
21  is no longer 100 percent, it's 15 percent, and ibuprofen will
22  cause a bleed to take place or put holes in your stomach wall.

23      So on the day in question, that would be May 9th, he gets
24  up at 9 o'clock in the morning, to 9:30, and he reports to work
25  at 7:30 that evening.  And he's on -- he's on that entire

1    regimen until 8 o'clock in the morning.

2        He leaves the VA Hospital about 8:10.  He's going to go to

3    the Embassy Suites, which is over on 10th Street, to go to bed.

4    As he's leaving, he takes trazodone, which was a prescription

5    that he had for sleep assistance and aid, as well as taking

6    another Percocet.

7        He's then called before he reaches the Embassy Suites and

8    asked to come back to the VA because of some questions that

9    they want to have answered at that point in time.  And at that

10   point in time he said he goes back, he sits in what he thinks

11   is the board of directors room until he's interviewed, as

12   Ms. Nguyen is being interviewed at that time by Mr. Hicks,

13   Cameron Hicks.

14       And that Cameron Hicks then undertakes his interview from,

15   I think, about 11:30 in the sentencing memorandum to about

16   12:30 that day.  And he's then escorted from that floor down to

17   the basement and placed in a cell.

18       And he stays in that cell until he's interviewed later

19   that evening by the OIG investigators on that, and I believe

20   that that is approximately 9:30 to 10:30 at night.  I don't

21   have it in front of me specifically.

22       The trazodone, I have pointed out, caused a loss of

23   cognitive ability and it is -- tries to put you to sleep at the

24   time.  The half-life means that when there's a half-life of

25   trazodone that it runs up to nine hours, so you still have

1   another half-life still in your body at the time that the
2   interviews are taking place.

3       I'm telling you that because of his prior experiences by
4   going to New York City in April of 2020 and seeing the death
5   that took place there, something this country hasn't seen
6   medically in a long, long time, probably not since World War 1
7   when we had the virus that killed so many people in this
8   country.  You know, he dealt with death on a daily basis.  He
9   points out in his life story of all of his patients, one
10  patient walked out of the hospital at that time in New York
11  City.

12      I also believe, in accordance with what the counselor
13  wrote, that the deaths that he will address in his statement to
14  the Court of the family members, that we have somebody who's
15  debilitated mentally.  And that Miranda, the seminal case on
16  keeping somebody up and trying to engage them in a confession,
17  you know, is similar in fact to what has taken place here, just
18  mentally speaking.

19      He was afforded -- he could have had an attorney.  He
20  didn't have an attorney during these interviews.

21      In addition to that, I had to point out in here about his
22  characteristics himself.  And that I asked him before I came
23  over here because if I was going to embarrass anyone because
24  his family is sitting back there.  And there's no question that
25  there is a bisexual nature to my client.  And I think that my

1   client, you know, has peculiar characteristics.  And that in

2   that event my client is not disparate -- it is not an

3   unwarranted disparity.  It is who he is.

4       And I pointed out that he -- that any amount of time, that

5   the fear that exists in him for any detention is immense.  And

6   that he pointed out on a stop about being in jail about

7   somebody taking his shoes, taking his food.  I think he will

8   experience that again.

9       I don't think that punishment, which I'm not asking for,

10  but I mean, I'm not -- I kind of feel like I'm St. Mary's

11  University for the Blind playing the University of Oklahoma.  I

12  understand what the Court earlier did with the co-defendant.

13      And I know that you're a just and honorable judge, but

14  under this -- that is a characteristic that this Court ought to

15  take into account when it imposes a judgment today for the

16  protection of him, because we're not terrorists with punishment

17  that we undergo here.  And I think that he will experience a

18  much harsher incarceration than somebody like myself would

19  have, or would.

20      I have -- have asked -- we're talking about a zero

21  criminal history background on this.

22      When you take all the facts put together, and the immense

23  amount of pressure that he was under trying to get this

24  operation.  After the operation, he's married at that time.

25  And after this event takes place, he's divorced.  He doesn't

1    have access to his son.

2        He has continued to be what I would say -- have a totally

3    sober environment where he is working now.  He makes $15.25.  I

4    may be wrong, it may be less than that.  %15.25 an hour.  He

5    owes $140,000 for student loans, and the student loans were for

6    the acquisition of his nursing license.

7        I do want to point out that when I talked to Ms. Walters

8    in the beginning, she said we do not -- the office does not

9    want him to continue to be a nurse.  He has no nursing license

10   now.  It has lapsed.  It is gone.

11       We have followed -- we have -- at least we have afforded

12   every -- cognitively speaking, every agreement that we have

13   made with the United States, we have followed through on.

14       I do not see what we get, the society, what you teach

15   somebody who's going to be, I think, terrorized in detention,

16   what we get out of that as a society.  What we know if we take

17   his post conduct with the job that he has now, with the record

18   that he has from probation, which is quite good, from where

19   he's being -- in the Northern District at this time.  He's even

20   had the amount of drug tests taken cut down dramatically.

21       So I'm asking for the mercy of the Court and I'm saying

22   this is not a warranted disparity.  It's an unwarranted

23   disparity.

24       I -- the disparity that exists is you have a unique

25   individual under the characteristics in 3553(a) that does not

1    need to go for any detention in this when you take all the

2    facts given together, a history of the human being, and what

3    took place.

4        So we're asking for probation.  That's what we're asking

5    for, Your Honor.  And I would suggest to you that if he would

6    fail in any way -- and you can give five years of supervised

7    release or five years probation.  If he fails in that in any

8    way, you could then resentence him because you granted him

9    probation.  And that on that you still maintain a hammer that

10   is more than enough to mete out justice, which in this instance

11   requires probation to be given for my client, Your Honor.

12            THE COURT:  Thank you.

13       Mr. Hansen, would you like to make a statement?

14            THE DEFENDANT:  Yes, Your Honor.

15       Your Honor, throughout this experience I have learned a

16   great deal not only about the importance of honesty, but

17   about --

18            THE COURT:  Slow down.  She's going to take this

19   down.  And we have got all the time you need, so slow down.

20            THE DEFENDANT:  Sorry.  I just feel like I'm going

21   to die if I don't talk fast enough.

22            MR. MEYER:  Don't.

23            THE DEFENDANT:  Throughout this experience, I have

24   learned a great deal not only about the importance of honesty,

25   but of authenticity and mental well-being.

1       During May 10th, 2021, and the preceding months and years,

2   I was subjected to many traumas and stressors which resulted in

3   a worsened mental status that included PTSD, major depressive

4   disorder, and generalized anxiety disorder.

5       These illnesses were left untreated and worsening for

6   several months to years prior to the incident.

7       I have had a history of a substance abuse or use since I

8   was 17 years old.  I have used alcohol, marijuana, cocaine, and

9   occasionally opiate medications throughout the years.

10       I was able to free myself from cocaine after experiencing

11   heart complications that resulted in me having to have a heart

12   cath at 25 years old, I believe.  But I continued to use

13   alcohol and marijuana throughout the years.

14       I traveled to New York City in April of 2020 at the peak

15   of the COVID pandemic, against the advice of everyone in my

16   family, against the advice of my friends.

17       I have a very caring heart and all I could picture

18   whenever I thought about New York City was what if that's where

19   my home state was and this great plague has set upon the city

20   and there's no one there to help, you know.  Like, I would be

21   begging for help.  And so I decided to go.  I wanted to help in

22   any way that I can.

23       The city was filled with a sense of doom.  The hospitals

24   were beyond capacity.  They were stacking bodies like Legos in

25   refrigerator trucks outside of every hospital.  There were more

patients than ventilators.  Some hospitals were putting two

separate patients on one ventilator and doubling the settings

because of the shortage.

The medical teams were in mass casualty triage mode, and

that meant that these teams were having to decide how to spend

resources to help patients -- the most patients with using the

least amount of resources, which meant that some patients would

succumb to the illness because of these decisions.  But it

really didn't seem to matter because whatever we --

THE COURT:  Try to slow down again.  She's having

to take this down.

THE DEFENDANT:  Sorry.  I'm sorry, Your Honor.

It really didn't seem to matter because whenever we used

our resources, everyone still seemed to die.  I have never seen

so much death and devastation in my life.

I felt often that I would die in the city, especially when

we started caring for the other people that we were working

with and they began to die.

I pretended to be strong, that it was normal, that I could

handle it.

I began a doctor of nursing anesthesia program and was

told not to work during the program due to stress.  The program

has a comparable rigor to medical school.  I continued to work.

I pretended to be strong, that it was normal, and that I

could handle it.

1      My family always involves me in medical decision-making

2 because of my experience, knowledge, and clinical judgment.  In

3 November of 2020, my Uncle Terry was diagnosed with COVID and

4 my family embarked on a six-week battle with a devastating

5 illness.  One step forward, two steps back.

6      There were sometimes dozens of calls and decisions every

7 day.  On January 1st, 2021, we were informed that our options

8 were to withdraw care or proceed with a tracheostomy and a

9 feeding tube, leaving him on a ventilator for the rest of his

10 life.

11      We knew that Uncle Terry, the great storyteller of our

12 family, would never agree to being unable to speak and living

13 on a ventilator, never again to regain consciousness.

14      My Aunt Gena made the difficult decision to stop his life

15 support.  He passed away peacefully.  However, I carried this

16 loss with me as a failure to save him every day when I look at

17 the necklace that contains his ashes.  I pretended to be

18 strong, that it was normal, and that I could handle it.

19      Six weeks later my Papa, who was my maternal grandfather,

20 was rushed to the emergency department in excruciating pain.

21 What they thought was a simple kidney stone was actually a

22 massive, unstable aortic aneurism.  My family tasked me with

23 choosing a hospital and a surgeon.

24      I chose Dr. Phillips at the Oklahoma Heart Institute in

25 Tulsa, Oklahoma, because I believed that he was the best.

1    There were complications during his surgery that added three
2    hours to his operation, for a total of seven hours.  He spent
3    the next few days in better spirits than ever and feeling
4    great, then his kidneys failed.  He ended up on a ventilator.
5    One step forward, two steps back.
6        Only my Nanny was able to see him because of the COVID
7    restrictions in place.  My Papa has always been firm about his
8    end-of-life decisions, no machines, and that he wanted to pass
9    away on his farm at home.  Despite several of us reminding
10   people of these wishes, my Nanny felt the pressure to pursue
11   everything she could for recovery, despite science proving it
12   was futile.
13       I feel these decisions were made because of the brief
14   period where my Papa woke up from surgery feeling better than
15   he had ever.  A month in the ICU battling for his life every
16   minute of every day, my Nanny made the difficult decision to
17   let my Papa go.
18       I was able to get special permission to get our whole
19   family at his bedside for his last moments.  He passed
20   peacefully, surrounded by his family, and the Nurse Lauren --
21   sorry -- who bore the same name as my dear cousin who was
22   killed in 2017.
23       I carry this loss with me as a failure every day of my
24   life.  I pretended to be strong, that it was normal, that I
25   could handle it, but I was fraying at the edges.

1     We interred my Papa's ashes and had a memorial ceremony on
2  April 2, 2021.  After the ceremony, everyone traveled to
3  Oklahoma City to prepare for my wedding.  My wife and I were
4  married the following day.
5     On April 14th, 2021, I had a vertical sleeve gastrectomy,
6  which had been scheduled for several months.  The procedure
7  removed about 85 percent of my stomach.  I was placed on
8  Oxycodone and recommended to use medical marijuana as well for
9  pain relief.  I could no longer take ibuprofen.  Mr. Meyer
10  explained that, so I won't repeat that.
11     I was required to return to work three to four days after
12  the procedure due to staffing shortage and the terms of my
13  contract or I would be terminated from the contract.  During
14  this contract I believe we were making about $100 an hour.
15  Traditionally -- so it would be a huge loss.
16     So traditionally people take about three to four weeks to
17  recover.  The pain was extreme while working, so I took
18  Oxycodone and used medical marijuana.  My diet was full liquid
19  and I was unable to get the nutrients I needed to function due
20  to the nausea and vomiting and the liquid diet.  Every day I
21  felt worse and worse, foggier and foggier.  I pretended to be
22  strong, that it had to be normal, and that I could handle it,
23  but I couldn't.
24     I continued to work despite my deteriorating condition,
25  and eventually resulted in getting admitted for nutrient

1    infusions a few weeks after the incident in question.

2        When I cared for Mr. Reeder the second time, I became

3    aware that his daughter Vicki had agreed to a

4    do-not-resuscitate order, but that she had refused dialysis --

5            THE COURT:  Slow down again.  Just take your time.

6            THE DEFENDANT:  I'm sorry, Your Honor.

7        When I had cared for Mr. Reeder a second time, I had

8    become aware that his daughter Vicki had agreed to a

9    do-not-resuscitate order, but that she had refused dialysis,

10   which was the only way that would have any chance to improve

11   his failed kidneys and his critical potassium level, as well as

12   refusing a central line, which is the national standard

13   required to give the medications that were being given to

14   Mr. Reeder.

15       I learned that his sons, Robbie and Randy, who he saw

16   every day, spoke out that he would not have ever wanted this,

17   but both worried about what Vicki, the daughter, might advocate

18   for.  Mr. Reeder did not have a power of attorney, advanced

19   directive, or any type of legal guardianship.

20       Nina and I were bathing Mr. Reeder.  She was much more

21   familiar with his background than I was, how he visited his

22   wife's grave twice a day since she passed on January 1st, 2021,

23   the same day that my uncle died.

24       I learned that he constantly told his children that when

25   it was his time, he was ready to see Mama.  Mr. Reeder was the

most ill person I have ever seen in my clinical career.  He was

suffering from profound neurological devastation, kidney

failure, liver failure, respiratory failure, cardiovascular

failure, gastrointestinal failure, skin failure, severe sepsis,

with his multisystem organ failure and shock, which alone can

kill someone in 12 hours.

Mr. Reeder's illness had become so profound that his blood

had become acid at a Ph of 6.01, I believe.  It was during this

time that the pumps were paused.  I remember pausing the

medications, but that Nina and I then switched sides of the

bed, continuing to care for Mr. Reeder.

THE COURT:  Slow down again.

THE DEFENDANT:  I'm so sorry, Your Honor.

THE COURT:  This is important.  I want to hear

this.

THE DEFENDANT:  Yes, sir.

It was during this time that the pumps were paused.  I

remember pausing the medication --

THE COURT:  When you pause pumps, what does that

mean?

THE DEFENDANT:  The medications were no longer

flowing.

THE COURT:  And why did you do that?

THE DEFENDANT:  I was so ill at the time that my

judgment was clearly affected, but if I had to take a guess,

1    Your Honor, it was because Mr. Reeder's end-of-life wishes were

2    not being followed.  And I know that it wasn't my decision to

3    make.  It's nobody's decision to make.  And I don't know why --

4    any other day of the week -- there are people here that have

5    worked with me, there are people here that come to me for

6    medical advice, and every single one of them would tell you

7    that that is not in my character, Your Honor.

8              THE COURT:  That's not what I'm asking.

9              THE DEFENDANT:  Yes, sir.

10             THE COURT:  I want to find out why you did it.

11             THE DEFENDANT:  Yes, sir.

12             THE COURT:  What did you think would happen?  Did

13    you think it would hasten his death?

14             THE DEFENDANT:  I knew that he had minutes to hours

15    regardless, and that there was a chance that it could, Your

16    Honor.  I don't want to hide any information.  I want to be

17    completely honest and authentic with you, sir.

18             THE COURT:  I understand.  Go ahead.

19             THE DEFENDANT:  It was during this time that --

20             THE COURT:  Let me ask you this also.

21             THE DEFENDANT:  Yes, sir.

22             THE COURT:  Whose idea was it?

23             THE DEFENDANT:  We were -- it's mutual, I guess.  I

24    can hardly remember much of what went on in that room because

25    of the disassociation that my therapist said that I

1    experienced, Your Honor.

2             MR. MEYER:  What was the question, Your Honor?  You

3    asked a question preceding him trying to answer.  What side

4    were you on?

5             THE COURT:  No, no, no.  Whose idea was it.

6             MR. MEYER:  Sorry, Your Honor.

7             THE COURT:  And were one of you superior to the

8    other one?

9             THE DEFENDANT:  No, sir.  We were both working as

10   registered nurses, sir.

11            THE COURT:  Okay.

12            THE DEFENDANT:  I had an advanced licensure, but I

13   was not employed under that licensure.  We had the same rank.

14       It was during this time that the pumps were paused.  I

15   remember pausing the medications, but that she and I then

16   switched sides of the bed, continuing to care for Mr. Reeder.

17       The pumps -- she kept the pumps off using the pump's delay

18   function, which is similar to pause.  There's no medication

19   flowing.

20       During the time when she was with the pumps, Lindsay Mason

21   briefly entered the room to check on the patient due to his

22   illness.  Both Lindsay Mason's statement and my drawing do have

23   Nina at the pumps during this exchange, but I do know that I

24   did initially pause the pumps, Your Honor.

25       At 6:07 a.m., I became overwhelmed with what was

1    happening, and I asked to turn the pumps back on.  Nina

2    responded that we should wait a few minutes.  Terror overtook

3    me, but I was frozen, terrified that even if I could force my

4    way to the pumps and turn them back on that it would draw

5    attention to the matter or that Nina would solely blame me for

6    our mutual action, and the second fear has proven to be true.

7    My mind had shattered.

8         It is my belief that the situation would have never

9    occurred without the untreated mental illness, the Oxycodone,

10   medical marijuana, nutritional deficits, and the stress of a

11   full-time and two part-time jobs in healthcare, as well as a

12   full-time doctoral program.

13        Prior to being interviewed, I was placed into handcuffs

14   and escorted to the office of Cameron Hicks.  During this time

15   I was under the effects of trazodone, Oxycodone, and marijuana.

16   I was threatened with "big boy federal prison" and overwhelmed

17   with fear.

18        I had never been in any situation like this.  I just

19   wanted to see my parents, my wife, and my son.  I was broken.

20   Your Honor, I willfully made a false statement by saying that

21   the pumps were not paused when I knew at that time that they

22   were.

23        I believe I made this false statement to Mr. Hicks because

24   I was terrified and wanted to see my family one last time after

25   he told me I was going to federal prison.

1        I initially made the same statement to the special agents,
2   but they gave me an opportunity to share the actual truth and I
3   did.  Your Honor, the rendition of the events I have given the
4   OIG, and now you, are the honest-to-God truth.
5        I have spent more than a decade in college and working as
6   a professional nurse or nurse practitioner.  I have dedicated
7   my entire life to helping people.
8        I was an expert.  I was someone who people consulted about
9   complex medical questions.  I know, as well as anyone who knows
10  me, that I would never harm anyone.
11       This situation has shattered me.  I wasn't strong.  These
12  situations weren't normal and I couldn't handle it.  And I
13  would have to remember this moment every day for the rest of my
14  life.  I wasn't myself and all of my friends and family knew
15  it.  I had damaged relationships with people I loved
16  tremendously --
17              THE COURT:  Slow down.
18              THE DEFENDANT:  Sorry.  Sorry, Your Honor.
19       I damaged relationships with people who I loved
20  tremendously with my actions, forcing them out of my life.
21       I had lost all sensibility in the aftermath of this event.
22  Since that day, Your Honor, I have never worked in a hospital
23  again, nor attempted to.
24       Following my arrest on this charge, while I was teaching
25  math at an alternative education high school in Sapulpa, I had

1    now lost everything, my license to teach, my license to

2    practice nursing, my wife, my son, two cars, my home, my job,

3    and my ability to achieve a sustainable income as well as my

4    ability to live on my own.

5        However, Your Honor, I have gained important things too.

6    By the efforts of myself, this Court, the United States

7    probation office, the therapist that they have assigned me, my

8    doctor, my family and my friends, I have achieved mental

9    wellness and sobriety for the first time in my adult life.

10       My mental health has drastically improved.  My doctor has

11   found a combination of medications that brings me stability in

12   my mental health.

13       I see my therapist every week.  Through this therapy I

14   have become a better person and have learned who I am outside

15   of the career that I once had.  Some of my most important

16   friends have forgiven me for the damage that I caused that

17   destroyed our friendships, and some of them are present in your

18   courtroom today.

19       Addiction no longer plagues my life.  As was set out in

20   the court orders, I was honest with potential employers about

21   my felony charge, my felony conviction, my responsibility in

22   the felony, which makes it nearly impossible for someone like

23   me to find work.

24       However, the administration of Help Works took a chance on

25   me knowing every last detail.  Help Works is a nonprofit

focused on supporting individuals -- excuse me, sorry -- with
intellectual and developmental disabilities.

I was able to take over contracts that were not generating
income and have increased this income.  I design and maintain
our website.  I teach CPR and medication administration
technician classes.  I have created our auditing program to
ensure that our individuals are being met -- their needs are
being met each week.

The individuals that we serve -- that I serve are so
special to me.  They inspire me with their strength, their
abilities, and their authenticity.  These individuals and my
coworkers have become my family.

One of the things I fear most in your courtroom today,
Your Honor, is that my incarceration will hurt these 36 people
who depend on me.  They would think I had abandoned them and
they would not be able to understand that the reason that I am
not there just rips my heart out.

It took upwards for myself more than a year to obtain the
necessary training and permission from the state of Oklahoma
and the American Heart Association to teach these required
certification courses because I no longer had a license.

Something -- this is not in the statement, so -- but I
feel led to share it.  Something that hurts the most about the
actions that I took on May 10th was that even the people that I
am meeting today are people that are damaged because of what I

1    did.  And I carry that with me all the time.

2        Your Honor, I fear that my incarceration in a facility

3    could result in immense damage to my mental health.  This is

4    due to my fear that I would not have access to my medications

5    for an extended period of time due to formulary restrictions in

6    these facilities, and the shortage of psychiatric providers.

7    My history of being sexually and financially exploited by

8    others due to my vulnerability would also cause me to

9    experience anguish in a detention facility.

10        When spending just a few days in jail following a DUI, I

11    was bullied out of my socks, sandals, and food, as well as

12    convinced to bail out another person who was in the jail.

13        I believe that my physical health could deteriorate

14    because I would not be able to have the CPAP machine that my

15    doctor prescribed me because I stop breathing when I sleep.  If

16    I lost my job as a result of incarceration, I would immensely

17    struggle to find gainful employment, as it has already been

18    proven very difficult even without incarceration.

19        Your Honor, it terrifies me the most that all the immense

20    progress I have made while under the orders of --

21            THE COURT:  I can't -- I can't understand you.

22            THE DEFENDANT:  I'm sorry.  I'm trying not to cry.

23        It terrifies me that all of the immense progress that I

24    have made while under the orders of this Court could be

25    destroyed by my actions on that day.

1    I have begun a Bible study for the addicts that was
2 supposed to start yesterday through my church, where I play the
3 piano and practice on the praise and worship team.

4    As of last week, my ex-wife has allowed me to start seeing
5 my son again, and I am working very hard to repair our damaged
6 relationship.

7    Your Honor, if probation is not an option at this time and
8 confinement is the will of this Court, I humbly request that
9 you consider the possibility of home confinement where I can
10 continue to serve others while maintaining my care team, my
11 mental health, and continuing to become a productive member of
12 society without my license to practice.

13    I was informed by my counsel early on that the -- one of
14 the goals of Ms. Walters was that I never practice again.  I
15 have made no attempts to reenter practice, nor do I intend to.

16    There are several people in this courtroom who have
17 encouraged me to continue to try to get my license back, and I
18 tell them the same thing every time.  Your Honor, I have no
19 interest in even creating a semblance of a situation that could
20 repeat an event like this.  I don't think that it's possible,
21 but I'm not willing to take a bet, Your Honor.

22    This lapse in my normally sound judgment has left me
23 broken, haunted, and a prisoner in my own mind as I relive
24 these traumas every day.

25    I have been filled with remorse since 6:07 a.m. on May 10,

1  2021, where I failed to correct the mistake that I started and

2  then issued a false statement.  I was even crying at the

3  nurse's station on the video in the discovery.

4      There isn't a day where my eyes don't well with tears and

5  my heart isn't filled with remorse and hatred to myself for the

6  damage I have caused so many people, and there likely won't be

7  until I draw my last breath.

8      Your Honor, thank you for the time you have spent

9  listening while I struggle through this statement, as well as

10  the time you have spent considering all of the matters of this

11  case.

12      God bless you, Your Honor, your court, and thank you for

13  everything that you have done for this country and the people

14  in it, sir.

15          THE COURT:  All right.  Let me hear from the

16  government.

17          MS. WALTERS:  Thank you, Your Honor.

18          THE COURT:  Why don't you-all sit down, and you can

19  come up here to the podium.

20          MS. WALTERS:  Thank you.

21      Thank you, Your Honor.  As stated by Mr. Meyer and as

22  stated in Paragraph 7 of the presentence report, and in the

23  plea agreement, the parties agree that probation is appropriate

24  in this case, but recognize this agreement is not binding on

25  this Court.

1    I do want to touch on a few things in the presentence
2  report briefly, Your Honor.
3    As Mr. Hansen stated, he did, at the time he made the
4  false statements, cried and confessed.  This compared to
5  Ms. Nguyen who bragged about getting away with what she told
6  the police as stated in Paragraph 30, specifically that she
7  said that she took the scared-girl approach.
8    I know that Mr. Hansen was originally charged with two
9  counts, and that in part is because he was more honest than
10  Ms. Nguyen at the time he was speaking to law enforcement and
11  confessed to two different entities.
12    We have, per the plea agreement, given this Court that
13  motion to dismiss Count 3 as part of the plea agreement, and
14  Mr. Hansen will be sentenced to one count, not two.
15    Even as Ms. Nguyen was giving her statement to this Court,
16  it appeared that she was minimizing.  And it wasn't until Your
17  Honor asked very pointed questions that she gave answers to
18  this Court's questions.
19    I say all that to say that if this Court is not going to
20  sentence Mr. Hansen to probation, we ask that he not be
21  sentenced to more time than Ms. Nguyen for those reasons.  And
22  again, we believe probation is appropriate in this case based
23  on all of the circumstances.
24            THE COURT:  All right.  Defendant and counsel come
25  back to the podium, please.

1       Well, Mr. Hansen, I have read and considered the
2   presentence report in your case, and all the materials that
3   Mr. Meyer obviously worked very hard in preparing, including
4   your statement.
5       I have considered your statement here today and I have
6   considered Mr. Meyer's statement and the government's
7   statement.
8       I have considered the sentencing factors set forth in 18,
9   U.S. Code, 3553.
10      I have considered what I sentenced Ms. Nguyen to.
11  Obviously, you-all did this together.  The conduct was the
12  same.  I do see some distinguishing factors.
13      I am going to give you a lesser sentence than I did her,
14  but I am going to incarcerate you.  I just feel very strongly
15  that a person that is a nurse or any kind of healthcare person
16  has got to know that they can't play God.  This is exactly what
17  I said to Ms. Nguyen.
18              THE DEFENDANT:  Yes, Your Honor.
19              THE COURT:  That that's not a decision for you to
20  make.  And the next time a person is in that position they have
21  got to know that there is a price to be paid.  And I -- but
22  I -- I take into consideration your remorse.  I think you're
23  sincerely remorseful.  I do think you had psychological
24  problems and physical problems that contributed to this.  I
25  give you credit for your having given up your nursing.

1    I'm confident that I'll never see you again and that you
2    can lead a productive life, but I do feel there has to be a --
3    a consequence to it.
4    With this in mind, it is the judgment of the Court that
5    the defendant is hereby committed to the custody of the Bureau
6    of Prisons for a term of three months.
7    I'm not imposing a fine.
8    I do recommend that you participate in the Inmate
9    Financial Responsibility Program.
10    Upon release, you shall be placed on supervised release
11    for a term of one year.
12    You shall comply with the special conditions listed in
13    Part D of the presentence report, which you'll need to
14    familiarize yourself with.  You'll pay a special assessment of
15    a hundred dollars, which will be due immediately.
16    Pursuant to your plea agreement, you have waived your
17    right to appeal or collaterally challenge the sentence imposed
18    except under limited circumstances.  To the extent that a right
19    of appeal survives this waiver, you're advised that the appeal
20    is to the United States Court of Appeals for the Tenth Circuit.
21    If you cannot pay costs, you may apply for leave to appeal
22    in forma pauperis, that is without payment of costs for a
23    transcript and an attorney at government expense.  Notice must
24    be filed within 14 days.  You may request the clerk to now
25    spread the same of record.

1      Mr. Hansen, I'm satisfied you're an intelligent person and

2  you're making a great effort to turn your life around.  And

3  I'm -- I appreciate that, and I --

4              THE DEFENDANT:  Thank you, Your Honor.

5              THE COURT:  -- I know you can still be a real asset

6  to your family and to the community, but I hope you understand

7  why I did what I did.

8              THE DEFENDANT:  Yes, Your Honor.

9              THE COURT:  Now, would you like to request a --

10             MR. MEYER:  I would like to request that we can

11  self-report, Your Honor, on January 5th.

12             THE COURT:  On January when?

13             MR. MEYER:  5th.

14             THE COURT:  Is that a Monday?

15             MR. MEYER:  That's a Friday.  If I want it on a

16  Monday --

17             THE COURT:  No, I don't.  January the 5th at

18  12 o'clock noon he'll report to the facility designated by the

19  Bureau of Prisons for your incarceration.

20      Do you have a question?

21             THE DEFENDANT:  Yes, Your Honor.  I have a -- so

22  I'm not sure how this works, which is why I'm asking.  I have a

23  court date with Cherokee Nation --

24             MR. MEYER:  No.

25             THE COURT:  I have signed the order of dismissal as

1    to Count 2 -- I'm sorry -- as to Count 3 of the indictment.

2        Anything else?

3            MS. WALTERS:  Nothing from the government, Your

4    Honor.

5            MR. MEYER:  No, Your Honor.

6            THE COURT:  You're excused.  Court will be in

7    recess.

8        (Court adjourned.)

9                    REPORTER'S CERTIFICATION

10           I, Emily Cripe, Federal Official Realtime Court

11   Reporter, in and for the United States District Court for the

12   Western District of Oklahoma, do hereby certify that pursuant

13   to Section 753, Title 28, United States Code that the foregoing

14   is a true and correct transcript of the stenographically

15   reported proceedings held in the above-entitled matter and that

16   the transcript page format is in conformance with the

17   regulations of the Judicial Conference of the United States.

18                    Dated this 13th day of February, 2024.

19

20

21                    **/S/ Emily Cripe**
                     EMILY CRIPE, CSR

22                   Federal Official Court Reporter

23

24

25